RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0388p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MILES CHRISTI RELIGIOUS ORDER, CESAR
BERTOLACCI, Father, and FRANCISCO CONTE-
GRAND, Brother,

        *Plaintiffs-Appellants,*

     *v.*

TOWNSHIP OF NORTHVILLE, CHIP SNIDER, in
his official capacity as Northville Township
Manager, JENNIFER FREY, in her official
capacity as Director of Community
Development for Northville Township,
JOSEPH BAUER, in his official capacity as
Ordinance Enforcement Officer for Northville
Township,

        *Defendants-Appellees.*

No. 09-1618

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-14003—Paul D. Borman, District Judge.

Argued: June 10, 2010

Decided and Filed: December 21, 2010

Before: BATCHELDER, Chief Judge; SUTTON and KETHLEDGE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Robert Joseph Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellants. Timothy S. Wilhelm, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, P.C., Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Robert Joseph Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellants. Timothy S. Wilhelm, Marcelyn A. Stepanski, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, P.C., Farmington Hills, Michigan, for Appellees.

     SUTTON, J., delivered the opinion of the court, in which KETHLEDGE, J., joined. BATCHELDER, C.J. (pp. 14–33), delivered a separate dissenting opinion.

————————

**OPINION**

————————

SUTTON, Circuit Judge.  A religious order and two of its members filed this action under the Religious Land Use and Institutionalized Persons Act and the Federal and State Constitutions against the Township of Northville and its officials based on a dispute over the application of several local zoning ordinances to a residence that the order owns in the township.  The district court concluded that the suit was unripe, and so do we.

I.

Since 2002, Miles Christi, an international religious order, has owned a five-bedroom house on a one-acre plot of land in a residential neighborhood in Northville, Michigan.  Several fathers and brothers of the order, six in all, live there.  The fathers conduct private daily masses in a small eighteen-person chapel inside the house for members of the order.  Miles Christi also hosts regular Bible studies "for invited friends and their children" with attendance ranging from five (the most common) to fifteen individuals.  R.1 ¶ 18.  Nothing on the exterior of the house suggests that the residents use it as a church or religious organization.

In March 2003, some Northville citizens wrote letters to township officials about the Miles Christi house, complaining about increased automobile traffic and the number of cars parked there and suggesting that the order was not using the house in compliance with the neighborhood's residential zoning.  Northville's Town Planner, Maureen Osiecki, replied to at least one of the letters by saying that "the priests may use this home as their residence" and that the house was "not a church, nor a parish."  R.31-10.

The complaints did not stop there.  Over the next few years, Joseph Bauer, Northville's Ordinance Enforcement Officer, continued to receive complaints about the

house. On several occasions, he drove by the property and made notes about the zoning issues implicated by the complaints, but he did not take any action.

In December 2006, a neighbor called Bauer to complain about the amount of traffic and the number of parked cars at the house. She believed that the property was being used as an office rather than as a residence. In response to these complaints, Bauer conducted more frequent surveillance of the house. On at least one occasion, he recorded the license plate numbers of the cars parked at the house.

Bauer was not the only one conducting surveillance. The fathers and brothers of Miles Christi took several photographs of an officially marked car driving by their property and recorded the times—several per day—when the car drove by.

On February 7, 2007, Bauer sent a letter to Father Cesar Bertolacci describing his surveillance of the property. "Follow-up observations," he wrote, showed that, during Sunday mass, "vehicles were parked on grassy areas in violation" of the zoning ordinance. R.31-12. He asked Miles Christi to "describe[] the measurements of the [oratory]" and to provide "an operations plan describing activities" so that the township could "determine if the present amount of parking is sufficient so vehicles do not park on grassy areas." *Id.* Bauer attached a copy of the township's parking ordinance, which provides:

> When building alterations . . . are to be made, or use or activity is contemplated that may produce parking demand in excess of available spaces, the Township shall require a sketch plan and other written documentation of the change or a parking study to document adequate parking is provided or will be expanded to meet anticipated needs.

Northville Code of Ordinances § 170-26.1(F). The township's ordinances generally require that one- or two-family homes have two parking spaces per dwelling unit. *See id.* § 170-26.2. But for "[c]hurches, temples or other places of worship," there must be "1 space per 3 seats or 6 feet of pews in the main unit of worship, plus any additional spaces needed for accessory uses," and the property owners must submit "[a]n operations

plan to describe all of the church-related activities . . . to support the amount of parking provided." *Id.*

Father Bertolacci responded by letter on March 1, 2007, describing the activities conducted at the home and the eighteen-person oratory. "In order to reduce any parking on the grass," he added, Miles Christi was "willing to expand [their] driveway if needed." R.31-12. Father Bertolacci "question[ed] the validity of the complaints" but assured Bauer that Miles Christi wanted to do its best both to serve the community and to live responsibly within it. *Id.*

On March 23, 2007, several residents of the Miles Christi house met with township officials to discuss the parking issue. Joining Bauer on behalf of the township were Chip Snider, Township Manager, and Jennifer Frey, Director of Community Development. Jennifer Frey told the order that the Miles Christi house was operating as "something other than [a] single family residence" and that "they needed to provide . . . an operations plan to support and justify the amount of parking they [were] provid[ing]." R.31-26 at 55–56. Ultimately, she said, Miles Christi would need to provide parking in the rear of its lot sufficient to meet peak demand, estimated at twenty to twenty-two people. When the residents explained that they could not feasibly locate additional parking in the rear of the lot, the officials told them that they would have to (1) request a variance from the zoning board of appeals to allow parking in the front yard and (2) submit a site plan to the Northville Planning Commission detailing the intended expansion of parking spaces and sufficient landscaping to block the view of parked cars from neighboring properties.

By June 5, 2007, Miles Christi had not submitted a site plan, prompting Bauer to issue a ticket for violating Ordinance § 170-33.3, which governs "[s]ite plan review procedures." The ticket directed Miles Christi to appear in state court on June 20, 2007, which Miles Christi did. *See People v. Miles Christi Religious Order*, No. 07v324326A (Wayne Cnty. Dist. Ct. June 20, 2007). The state-court proceedings developed an

extensive record, including depositions of members of Miles Christi and township officials discussing the events leading to the ticket.

On September 21, 2007, Miles Christi, Father Bertolacci and Brother Francisco Conte-Grand filed this action in federal court. They challenged the legality of Northville's zoning ordinances as applied to the Miles Christi house and the conduct of township officials in enforcing the ordinances, invoking the free-exercise protections of the First and Fourteenth Amendments, the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Michigan Constitution. They sought declaratory and injunctive relief, money damages and attorney's fees.

The state court stayed the enforcement proceeding pending the outcome of the federal action. The township defendants moved to dismiss the federal case, arguing that Miles Christi has not received a "final decision" about the application of Northville's zoning ordinances to their property, making the religious order's claims unripe. The district court agreed and dismissed the complaint without prejudice, reasoning that the township's final decision concerning the application of the zoning ordinances is still "unknown" because Miles Christi has not appealed the demand for a site plan to the zoning board. Miles Christi appeals.

II.

The ripeness doctrine encompasses "Article III limitations on judicial power" and "prudential reasons" that lead federal courts to "refus[e] to exercise jurisdiction" in certain cases. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The "judicial Power" extends only to "Cases" and "Controversies," U.S. Const. art. III, § 2, not to "any legal question, wherever and however presented," without regard to its present amenability to judicial resolution. *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc). And the federal courts will not "entangl[e]" themselves "in abstract disagreements" ungrounded in the here and now. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967); *see Warshak*, 532 F.3d at 525. Haste makes waste, and the "premature adjudication" of legal questions compels courts to resolve matters, even

constitutional matters, that may with time be satisfactorily resolved at the local level, *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807; *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 617 (6th Cir. 2008), and that "may turn out differently in different settings," *Warshak*, 532 F.3d at 525.

To decide whether a dispute has ripened into an action amenable to and appropriate for judicial resolution, we ask two questions: (1) is the dispute "fit" for a court decision in the sense that it arises in "a concrete factual context" and involves "a dispute that is likely to come to pass"? and (2) what are the risks to the claimant if the federal courts stay their hand? *Warshak*, 532 F.3d at 525; *see Abbott Labs.*, 387 U.S. at 149. In the land-use context, the demands of "a concrete factual context" and "a dispute that is likely to come to pass" converge in an insistence on "finality," an insistence that the relevant administrative agency resolve the appropriate application of the zoning ordinance to the property in dispute. In the related context of takings claims under the Fifth and Fourteenth Amendments, courts likewise insist that a claimant "obtain[] a final decision regarding the application of the zoning ordinance[s] . . . to its property," *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), a requirement rooted in ripeness considerations, *see id.* at 186–94; *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012–13 (1992). In addition to takings claims, we have applied the finality requirement to other constitutional and statutory challenges to local land-use requirements. *See Grace Cmty. Church*, 544 F.3d at 615 (RLUIPA); *Insomnia Inc. v. City of Memphis*, 278 F. App'x 609, 613 (6th Cir. 2008) (Free Speech Clause); *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1362 (6th Cir. 1992) (Equal Protection Clause).

Miles Christi has not satisfied either requirement for bringing this claim now. It has not shown that "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty.*, 473 U.S. at 186; *Grace Cmty. Church*, 544 F.3d at 615. And it has not shown that it will suffer any hardship by delaying a federal court decision until the zoning board acts.

*No final decision.* Miles Christi concedes that it has not gone to the zoning board to determine whether the ordinances require it to submit a site plan and, if so, which regulations impose this obligation and why. And it does not deny that the administrative process permits residents to seek a variance. What the religious order says instead is that Jennifer Frey's request that Miles Christi provide a site plan, based on a determination that the home was being used in a more intensive way than residential zoning permits, amounts to the kind of final decision necessary to overcome these ripeness concerns.

This position, however, does not square with the relevant regulations. At the time the complaint was filed, the Northville Code provided that "[t]he Zoning Board of Appeals shall be responsible for interpretations to the text of [the zoning ordinances]" and shall be responsible for "interpret[ing] the provisions or meaning of standards of [the ordinances]." § 170-41.4(D) (2007); R.31-39 at 8. In the context of site plan review, the Code provided that "[t]he application may be tabled if it is determined . . . [that] an ordinance interpretation or variance is needed from the zoning board of appeals." § 170-33.3(G)(1) (2007); R.31-38 at 7. Today's regulations are to the same effect, providing that "prior to initiati[on] of site plan review," a property owner should appeal to the zoning board "[i]f an ordinance interpretation or variance is needed." § 170-33.3(B)(1) (2010). An administrative appeal to the zoning board thus will resolve at least three questions, all of which lie within the zoning board's plenary interpretive jurisdiction, about Miles Christi's obligations or indeed whether it has any obligations at all: (1) Has Miles Christi put its house to a "more intensive use" within the meaning of § 170-33.2 of the Northville Code? (2) Is the Miles Christi house a "church" within the meaning of § 170-26.2 of the Code? and (3) Does Miles Christi have an obligation to submit a site plan in the first instance in view of the meaning of these ordinances and its request for a variance? Finality requires the input of the zoning board on these unresolved questions.

*No hardship to Miles Christi.* An appeal to the zoning board not only will ground this dispute in a concrete legal setting—by permitting the zoning board to clarify the township's application of its land-use laws to this property—but it also may help

Miles Christi. The zoning board may grant a variance to the religious order, or it may provide a different intensive-use determination. Both forms of relief will considerably narrow the grounds of dispute between the parties if not end the dispute altogether. Far from imposing a hardship on Miles Christi, an appeal to the zoning board may give the order the very relief it seeks: the chance to live and serve the Northville community without further inquiries, or for that matter harassment, from the neighbors and township officials.

We have been down this road before. In *Grace Community Church*, a township issued a special use permit to a church, and one month later the township revoked the permit after a neighbor complained that the church was not complying with the conditions of the permit. 544 F.3d at 615–16. The church filed a federal action challenging the revocation under RLUIPA and the Equal Protection Clause rather than appealing the revocation to the zoning board. *Id.* at 611. In dismissing the claims on ripeness grounds, we noted that the church had made "no effort to resolve the dispute locally": It did not attempt "to complete the factual record, to more fully explain its position to the Commission, to seek reconsideration, or to appeal the revocation decision" to the zoning board. *Id.* at 616. What was true there is just as true here.

Unlike *Grace Community Church*, Miles Christi responds, a voluminous record makes its and the Township's positions "well defined." Miles Christi Br. 44. But the existence of an extensive record—Miles Christi's response to the township's summary judgment motion, including exhibits, comprises over 750 pages—is not the same as "a concrete factual context," which is what matters. *Warshak*, 532 F.3d at 525. Indeed, in *Warshak*, a case also dismissed on ripeness grounds, the record included numerous exhibits relating to government officials' past conduct, *see Warshak v. United States*, No. 06-cv-00357 (S.D. Ohio June 12, 2006), but nothing that shed light on the material question of what government officials would do in the future, *see Warshak*, 532 F.3d at 526–27.

Nor do the parties' summary judgment attachments, including photographs, letters, deposition transcripts and other documents, make up for the same omission that doomed an early federal resolution of the dispute in *Grace Community Church*: a definitive statement from the zoning board, the entity charged with interpreting Northville's zoning ordinances, about which ordinances apply to Miles Christi and about whether Miles Christi must submit a site plan under the ordinances. As things now stand, "we have no idea," *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163 (1967), whether the township's position, as determined by the zoning board, *see* § 170-41.4(D) (2007); § 170-33.3(G)(1) (2007); § 170-33.3(B)(1) (2010), is (1) that Miles Christi must submit a site plan because there has been a "change in the use of land . . . to a more intensive use, in terms of parking," § 170-33.2, (2) that Miles Christi must submit a site plan because its property is a "[c]hurch[], temple[] or other place[] of worship," § 170-26.2, or (3) that the property is a "single-family home on an individual lot" and therefore "exempt from site plan review," § 170-33.2(A). We might have a sense of what a few township officials think but, by filing this lawsuit when it did, Miles Christi pretermitted the opportunity to submit this issue to the body given decision-making authority over it. How can we know whether the township "has gone too far," as Miles Christi claims, until we "know[] how far the regulation goes," *MacDonald, Sommer & Frates v. Yolo Cnty.*, 477 U.S. 340, 348 (1986), and indeed which regulations apply?

Even aside from these concerns, we cannot say as Miles Christi does that the Township's position is "well defined." During the state court proceedings, Frey testified that she did not know under which ordinance Bauer was going to issue a ticket, only that it would be a ticket for "[v]iolations of the zoning ordinance." R.31-26 at 62. She also testified that she had not classified the Miles Christi house as a church but had simply determined that it was "something other than a single family residential" home. *Id.* at 54–55. Yet, according to the complaint, which we must take as true at this stage of the case, Frey previously told Miles Christi that it was a "small church" under the zoning ordinances and as a result would have to provide additional parking. R.1 ¶ 41. The Township's back-and-forth positions may well bolster Miles Christi's efforts to establish

the bona fides of its claims on the merits, but they undermine any notion that the Township's position is sufficiently "well defined" to ripen this dispute into a matter appropriate for judicial resolution.

Miles Christi protests that, as a matter of hardship, the township put it to a "Hobson's choice" of incurring "the costs and burdens associated with submitting" a site plan on the one hand or continuing constitutionally protected activities on the other. Miles Christi Br. 31–32, 51. But that is a false dichotomy. There is a third option—going to the zoning board—which may put this entire dispute to rest and which at a minimum makes Miles Christi's choice anything but Hobsonian. The zoning board may determine, as a matter of interpretation, that the Northville Code does not require it to submit a site plan. Or it may determine, as a matter of discretion, administrative grace if you will, that Miles Christi should get a variance. Either way, Miles Christi will be able to continue its current use of the house without incurring additional costs or burdens.

Miles Christi adds that the township's actions have had a "chilling effect" on its constitutionally and statutorily protected activities: Threatening to ticket vehicles parked on the lawn, conducting surveillance of the religious order, recording license plates and issuing a ticket for a zoning violation all have "limit[ed]" the order's "religious activities." Miles Christi Br. 51–52. It is true that the existence of a constitutional claim, particularly a First Amendment claim, affects the hardship component of the ripeness inquiry. *See Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002). And it may be true that Northville thus far appears to have an undeveloped sense for the concept of religious liberty, as illustrated by this statement at oral argument: "[F]ootball parties and tailgate parties" do not change "the residential nature of the use; whereas, what they're doing here, they're doing religious education and they're worshipping." Not just the Framers of the Constitution but Congress itself has distinguished between the protections afforded these distinct activities: While the United States Code contains a Religious Freedom and Restoration Act and a Religious Land Use and Institutionalized Persons

Act, one will search in vain for a Freedom to Watch Football on a Sunday Afternoon Act.

But a claim does not become ripe at the first whiff of governmental insensitivity or whenever a government official takes an adverse legal position against someone, even if one potential response is to curtail protected activities. One justification for the ripeness doctrine is that it avoids the premature resolution of constitutional questions, including First Amendment questions. *Warshak*, 532 F.3d at 525; *Grace Cmty. Church*, 544 F.3d at 615. And "the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action." *Younger v. Harris*, 401 U.S. 37, 51 (1971). The answer instead is to look at each case to determine the consequences of staying our hand. That does not pose a problem here, as Miles Christi may potentially resolve the issue (at less expense) by appealing to the zoning board, *see* Northville Ordinance § 170-41.4(D) (2007); § 170-33.3(G)(1) (2007); § 170-33.3(B)(1) (2010), a route that does not require Miles Christi to cancel any Bible studies, masses or other religious activities and a route that does not require it to pay for an engineering study *in the event* the township rejects its interpretation of the ordinances or fails to give it a variance.

But *Williamson County*, Miles Christi protests, says that claimants need not "seek review of an adverse decision and obtain a remedy" in a state forum or otherwise "exhaust" its claims in the state courts, 473 U.S. at 193, and that effectively is what the district court made it do. Yet the Northville Code provides that, when "an ordinance interpretation or variance is needed," a property owner should go to the zoning board during or before the site plan review process, not after. § 170-33.3(G)(1) (2007); § 170-33.3(B)(1) (2010). Rather than merely "review[ing]" the "initial decision[]" of township officials made during the site plan review procedures, the zoning board is "empowered . . . to participate in the . . . decisionmaking" process from the outset, and it is only through that process that the township can provide what *Williamson County* demands: "a definitive position on the issue." 473 U.S. at 193. Because Miles Christi's claims

turn on the meaning of the ordinances, they will not ripen until the zoning board weighs in, a precondition that goes to finality, not to exhaustion of other remedies.

The finality rule, we acknowledge, is a "prudential requirement[]," and we need not follow it when its application "would not accord with sound process." *Lucas*, 505 U.S. at 1012. But for the reasons given, we fail to see why this prudential requirement should be ignored here. *Both* parties, to say nothing of the federal courts, may benefit from the zoning board's input, and the claimant, Miles Christi, faces no jeopardy in the interim, in view of the suspension of the state-law ticketing proceeding.

*Murphy v. New Milford Zoning Commission*, 402 F.3d 342 (2d Cir. 2005), does not alter this conclusion but indeed bolsters it. The *Murphy* claimants hosted weekly prayer meetings in their home. *Id.* at 345. After several complaints from neighbors, the town informed the Murphys that the zoning laws barred them "from hosting regularly scheduled meetings exceeding twenty-five non-family members." *Id.* at 344. The town eventually issued a cease and desist order, and the Murphys filed a lawsuit in federal court rather than appealing to the zoning board. *Id.* at 345. The Second Circuit concluded that the Murphys' claims, even those under the First Amendment and RLUIPA, were unripe. *Id.* at 354. In reaching this conclusion, the court noted, as we have noted, that "the ripeness doctrine is somewhat relaxed" in First Amendment cases. *Id.* at 351. The court distilled from its prior (Second Circuit) cases a two-part "preliminary inquiry": First, have the plaintiffs "experienced an immediate injury" as a result of the town's actions? And second, would compliance with the finality requirement serve to "further define their alleged injuries?" *Id*. After considering these questions, *Murphy* concluded that there was no reason to set aside the finality requirement. Just as the cease and desist order in *Murphy* did not give rise to an immediate injury worthy of immediate judicial intervention, *see id.*, so also here.

There is, to be sure, one difference between the Murphys' case and today's case: Northville issued a ticket to Miles Christi, while the town did not do the same to the Murphys. Yet it is not clear which way the existence of this state court enforcement

action cuts. In the criminal context, a pending state court action concerning the same issues implicated by a federal civil action *requires* the federal courts to abstain from resolving the civil action until the state courts have acted. *Younger*, 401 U.S. at 40–41. And the *Younger* abstention doctrine applies to at least some types of state court administrative enforcement actions. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 594 (1975); *cf. Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 791 (6th Cir. 2004). But we need not resolve this point today because this feature of *Murphy* makes no difference for a separate reason: Northville's ordinances expressly provide that "[a]n appeal [to the zoning board] shall stay all proceedings in furtherance of the action appealed . . . ." § 170-41.2(B)(3). Under the local law, any potentially coercive effect caused by a ticket can be stopped in its tracks by the modest step of appealing to the zoning board. The same was true in *Murphy*. At the same time that the court acknowledged that town officials did not have "any arresting or fining power," it noted that an appeal to the zoning board would stay any enforcement proceedings. 402 F.3d at 351. Northville's issuance of a ticket, subsequently stayed by operation of law, does not require the federal courts to resolve Miles Christi's action now.

III.

For these reasons, we affirm.

———————————

## DISSENT

———————————

ALICE M. BATCHELDER, Chief Judge, dissenting. Because I believe that the majority opinion does not adequately account for the First Amendment implications of this case and conflates the exhaustion of administrative remedies with the obtaining of a final decision, I respectfully dissent.

This case revolves around Jennifer Frey's intensity determination, not, as Northville frames it, the possible end result of the larger zoning process. The two are in fact distinct, and Miles Christi's claims arise from Frey's decision. Miles Christi was thrust into the current controversy, not because of any actions it initiated, but solely because of actions initiated by state officials. Frey, acting pursuant to her authority as Director of Community Development, determined that Miles Christi had intensified the use of its property; yet Miles Christi was merely using its property exactly as it always had. Frey's decision immediately harmed Miles Christi's First Amendment rights, and that harm cannot be undone by any retrospective relief that Miles Christi might obtain from the Zoning Board of Appeals ("ZBA").

Because Miles Christi suffered a First Amendment harm, this case is not a run-of-the-mill takings clause case. Takings clause cases, though applicable, cannot fully address the issues presented here because the First Amendment triggers concerns unaccounted for by the traditional takings clause analysis.

Further, any relief that the ZBA may ultimately provide does not impact the finality of Frey's intensity determination. The line between exhausting administrative remedies and obtaining a final decision is often obscure, but the two concepts are distinct. Everything that happened to Miles Christi is a result of Frey's decision. That decision was final and had an immediate, harmful effect. Any relief that the ZBA may provide is merely an administrative remedy, and its availability has no bearing on the finality of Frey's intensity determination.

**I.**

A review of the record below clearly demonstrates that it was Frey's decision that placed Miles Christi in its current position. Miles Christi is an international Catholic religious order. Since 2002, this particular community has resided in a single-family home in Northville. Also since 2002, Miles Christi has continuously used its home for private daily masses and Bible studies. From 2002 until the events in 2007 giving rise to this litigation, Miles Christi's use of its property remained unchanged.

As the majority opinion indicates, Fr. Bertolacci met with various township officials in March 2007 to discuss the parking problem. At the meeting, Frey stated that she had determined that Miles Christi's use of the property had become more intensive—that the use had changed from that of a single family residence to a more intensive non-residential use. She explained that the use now resembled a small church or place of worship. Accordingly, she insisted that Miles Christi would have to go through the town's site review process, beginning by submitting a site plan, to ensure there were sufficient parking and landscaping buffers, along with other requirements. *See* Northville Code of Ordinances §§ 170-26.2, 170-26.3. Fr. Bertolacci protested this decision.

Miles Christi hired an engineering firm to estimate the cost of compliance with the ordinances. That review cost about $5,000. The firm estimated the compliance cost at around $80,000, along with the cost of completing and submitting the site plan itself, which could cost an additional $30,000.

Miles Christi did not submit the site plan on the required date, and Bauer issued a civil infraction ticket to the Order on June 5, 2007. Issuance of the ticket commenced legal proceedings in state court to enforce Northville's requirement that Miles Christi submit a site plan. The ticket required Miles Christi to appear in state district court on June 20, 2007, and carried the potential penalty of a sizable fine.

Miles Christi did not pursue any administrative appeals with the Zoning Board of Appeals ("ZBA") or seek a variance, but instead challenged the ticket in the state court proceeding that Northville had initiated. The Michigan district court dismissed the case, ruling that the regulation was overly vague and subjective because it contained no standard by which to judge what constituted a "more intensive use" of the property. Northville appealed, and the state circuit court reversed and remanded. On remand, the parties agreed to hold the case in abeyance pending the results of this federal litigation.

Miles Christi claims that as a result of the ticket and the threat of future enforcement—including a threat to ticket attendant vehicles if there were too many or if any were parked on the grass—it has refrained from asking friends to join it for religious or other social activities. The Order has continued to celebrate Mass in the oratory and does have on its website a notice for continuing Bible studies and religious activities.

Plaintiffs filed this suit on September 21, 2007, in federal district court raising claims under 42 U.S.C. § 1983 for violation of their First Amendment free exercise, free speech, and association rights, as well as their Fourteenth Amendment rights to due process and equal protection. Plaintiffs also claimed violations of RLUIPA and the Michigan Constitution. Northville filed a motion to dismiss the suit for lack of subject matter jurisdiction under Federal Rules of Civil Procedure rule 12(b)(1), which the district court granted without prejudice on April 30, 2008. The district court held that the claims were unripe because Miles Christi had not obtained a final decision from the local land-use authority. Miles Christi brought this timely appeal, focusing on Frey's intensity determination.

## II.

We review an order to dismiss for lack of subject matter jurisdiction *de novo*. *Wagenknecht v. United States*, 533 F.3d 412, 415 (6th Cir. 2008).

### A.       Ripeness Requirements

Ripeness is a justiciability doctrine arising from both Article III limitations on federal judicial authority and prudential concerns. *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). Its purpose is "'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* at 807 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).

Courts generally consider three factors to determine if a claim is ripe: (1) "the likelihood that the harm alleged by [the] plaintiffs will ever come to pass"; (2) "whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims"; and (3) "the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Adult Video Ass'n v. U.S. Dep't of Justice*, 71 F.3d 563, 568 (6th Cir. 1995) (internal alterations, quotation marks and citations omitted). The test has also been articulated as "two basic questions: (1) is the claim fit for judicial decision in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is the hardship to the parties of withholding court consideration?" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (internal alterations, quotation marks, and citation omitted).

The United States Supreme Court has articulated an additional "finality" requirement for ripeness in the land-use context. *See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985). In *Williamson County*, a Fifth Amendment takings case, the Court held that a regulatory takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.*; *see also MacDonald, Sommer & Frates v. Cnty. of Yolo*, 477 U.S. 340, 348 (1986) (holding that an "essential prerequisite" to the assertion of a takings claim "is a final and authoritative determination of the type and intensity of development legally permitted on the subject property"). Whether the decision of the appropriate governmental entity

is "final" for these purposes is not dependent upon the takings claimant's having exhausted futile or remedial appeals; what matters is that the governmental entity has been given the opportunity to apply the local regulations to the particular piece of land in question, including resolving any available variances. *Id.* at 190, 193; *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736–37, 739 (1997) (noting that "*Hodel* thus held that where the regulatory regime offers the possibility of a variance from its facial requirements, a landowner must go beyond submitting a plan for development and actually seek such a variance to ripen his claim," but not requiring such requests where no discretion was permitted by regulations (citing *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 297 (1981))); *MacDonald*, 477 U.S. at 348 ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes."). This requirement conforms with the high degree of flexibility and discretion possessed by most land-use boards and the singular nature of each particular parcel of land to which a regulation may be applied. *Suitum*, 520 U.S. at 738–39.

The finality requirement is a prudential rule, and may be set aside if, under the circumstances, it does "not accord with sound process" or it would be imprudent to apply it. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012 (1992); *Guggenheim v. City of Goleta*, 582 F.3d 996, 1008 (9th Cir. 2009) ("[T]he Court has explicitly held that the *Williamson* requirements are prudential requirements.").

We have previously cited with approval to a threshold test used by the Second Circuit when determining whether to apply *Williamson County*'s prudential finality requirement to First Amendment claims in the land-use context. *Insomnia Inc. v. City of Memphis*, 278 F. App'x 609, 614 (6th Cir. 2008) (unpublished) (citing *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 350 (2d Cir. 2005) and *Doughtery v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002)). The Second Circuit held in *Murphy* that *Williamson County*'s finality requirement should be employed with caution in resolving First Amendment claims, and therefore undertook "a preliminary analysis" to determine whether it applied. *Murphy*, 402 F.3d at 350–51; *see Doughtery*, 282 F.3d at 90 (2d Cir. 2002) ("[I]n the First Amendment context, the

ripeness doctrine is somewhat relaxed."). Whether it applies in a specific case is a fact-specific threshold question. *Murphy*, 402 F.3d at 350. To that end, the court asked "(1) whether the [plaintiffs] experienced an immediate injury as a result of [the defendant's] actions, and (2) whether requiring the [plaintiffs] to pursue additional administrative remedies would further define their alleged injuries." *Id.* at 351. This relaxed approach is consistent with *Lucas*, as well as our approach in other First Amendment cases. *See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999) ("In the First Amendment arena . . . especially when there is a possibility that, rather than risk punishment for his conduct in challenging the statute, [an individual] will refrain from engaging further in the protected activity, courts have been willing to relax prudential standing limitations . . . ." (alterations in original)).

In *Insomnia,* we noted that the Second Circuit had "declined to apply the finality requirement in a limited set of First Amendment challenges to land use disputes," and we purported to rely on *Murphy*'s threshold test, finding its factors to be satisfied. *Insomnia*, 278 F. App'x at 614, 615–16. We did not, however, go on to apply *Williamson County*'s analysis to determine if there was a final decision. Instead, we seemed to rely on the threshold analysis to answer that question. *See id.* at 616 ("Taken together, [*Murphy*'s] two prongs indicate that the district court acted properly in dismissing Plaintiff's claim as premature."). *Insomnia* is an unpublished decision, and is not binding precedent. In order to clarify the analysis, I would hold that *Murphy*'s threshold test applies to First Amendment claims in the land use context, and that the threshold question is distinct from the finality determination.

I therefore would consider on review whether *Williamson County*'s prudential finality requirement applies to Miles Christi's specific First Amendment claims. If it does, we must decide whether Miles Christi has a final decision for purposes of all its claims. If the finality requirement does not apply to the First Amendment claims, then we must consider the finality requirement to determine the ripeness of the remaining claims. If the finality requirement is satisfied, we must still ensure that Miles Christi's

claims satisfy Article III ripeness. *See Lucas*, 505 U.S. at 1013; *Suitum*, 520 U.S. at 742–44 (addressing general ripeness concerns after holding that a final decision had been made for purposes of *Williamson County*). I address the immediate-harm prong of the threshold test first.

### B.    *Murphy*'s Threshold Test—Immediate Harm

The district court found that Miles Christi did not suffer an immediate harm from Northville's decision.[1] It found that Miles Christi's decision to cancel the Bible study and limit visitors was voluntary because Northville did not issue a cease-and-desist order. "Defendants did not require, or even suggest[,] that Plaintiffs limit the number of guests to the property." R.50 at 11. It found further support from the fact that Miles Christi's decision to limit visitors could not cure the reason for the infraction ticket, which was a failure to submit a site plan, and from the fact that the religious activities are currently on-going on the property. It did not specifically consider any other harms.

Miles Christi argues that it did suffer immediate harms from Northville's decision, including: suppression of speech in the cancellation of a Bible study due to police surveillance; the "chilling" of speech and religious activities due to the threat of vehicle tickets or zoning citations; having to pay $5000 for an unnecessary engineering study; being put to the choice of either paying for an expensive site plan or curtailing or eliminating the Order's religious activities because of Frey's intensity decision; and being ticketed, haled into state court, and potentially subjected to a substantial civil fine. Miles Christi stresses the First Amendment injuries, arguing that "even a momentary loss of First Amendment rights constitutes irreparable harm." Appellant Br. at 50 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Order contends that Northville's expressed reasons are pretextual, and that the town's actions have been motivated by discriminatory animus towards their religious activities, or a desire to placate the Order's

---

[1] I note that the district court, following *Insomnia*, did not structure the analysis in the form of a threshold question. Rather, it first decided that there was no final determination, and then analyzed the two-part test from *Insomnia* and *Murphy*. See R.50 at 11. My proposed clarification of the test would prevent this improper approach in the future.

unhappy neighbors by forcing the Order to reduce its activities, or both. Miles Christi also claims the harms are accentuated by vague regulations' being arbitrarily and subjectively applied to chill its protected activities. Miles Christi strongly disagrees with the district court's finding that Northville did not require it to limit its guests or religious activities, arguing that limiting visitors was necessary to cure the "more intensive use" finding by Northville in order to prevent further claims of infraction.

Northville argues that requiring the site plan does not inflict a harm, but is merely a necessary procedural step towards obtaining a final decision; and that the civil infraction ticket is not a harm, because the proceedings have been stayed. Northville claims that the ticket can still be appealed to the ZBA, although at oral argument it contended that even *that* step would not result in a final decision because the local authority would still have to determine exactly what Miles Christi would have to do to conform its property to local ordinances. The town points out that Miles Christi has not yet been subjected to any fines or criminal sanctions, and claims that Miles Christi would not need to eliminate its religious activities, but merely needs to resolve the parking problem associated with the activities. Finally, Northville disagrees that its activities chilled Miles Christi's speech.

I note, as a preliminary matter, that the Supreme Court has declined to apply the finality requirement where further administrative avenues are available, if pursuit of those avenues could not result in a remedy for past deprivation. *Lucas*, 505 U.S. at 1012. In *Lucas*, a landowner sued the state for an unconstitutional taking when a new law made development of his coastal property illegal. When the landowner filed his case, no administrative avenues were available, but the state legislature changed the law while his case was before the South Carolina Supreme Court, providing an avenue whereby a state administrative body could issue special permits for construction in the otherwise off-limits zone. *Id.* at 1011–12. Despite the state's argument that, given the new administrative avenues for relief, the landowner had not received a final decision, the South Carolina Supreme Court decided the case on the merits. *Id.* at 1011. On appeal to the United States Supreme Court, the state argued that the landowner's claim was

unripe under *Williamson County* because he had not applied for the special permit.  The Court disagreed, holding that the finality requirement did not apply to the plaintiff's claims because the special permits were available to allow *future* use of the landowner's property and, even if granted, an application for special permits could do nothing to alter the fact that he had already suffered an undeniable deprivation of the use of his property. *Id.*

In *Murphy*, the Second Circuit applied the finality requirement, holding that a cease-and-desist letter, alone, was not sufficient to constitute an injury.  The plaintiffs held large Christian prayer meetings in their home, hosting between 10 and 60 persons weekly.  *Murphy*, 402 F.3d at 345.  After the neighbors complained about the traffic, number of cars, and noise from these gatherings, the town investigated and then sent an informal letter to the plaintiffs, advising them that the large prayer meetings were not a "customary accessory use in a single-family residential area."  *Id.*  Two days later the plaintiffs sued in federal district court.  The town later sent a formal cease-and-desist letter, which the plaintiffs incorporated into their amended complaint.  The plaintiffs did not appeal the cease-and-desist order or request a variance.  The district court found for the plaintiffs and issued an injunction against enforcement of the regulations.  The Second Circuit reversed.  First, it held that the cease-and-desist order did not subject the plaintiffs to an immediate injury.  The town did not have the power to enforce the letter by arrests or fines without taking the additional step of bringing an action in state court, so there was no threat of immediate harm.  *Id.* at 351.  Also, an appeal of the order to the zoning board would have yielded an automatic stay of enforcement.[2]  Next, the court held that the record was insufficiently developed, and that further administrative actions below would help to define it.  *Id.* at 351–52.  The court relied heavily on the zoning board's power under Connecticut law to find facts and apply zoning regulations to those facts, and to review the town's decision de novo.  *Id.* at 352.  Accordingly, the court

---

[2]Whether this should have been considered against the plaintiffs is questionable.  While *Williamson County*'s holding was dependent on the local laws and the relative powers of local entities, it was clear that a land-owner does not have to seek an *appeal* of an initial determinative decision.  The specific authority of the body that is "appealed to" is critical, as *Williamson County* explained by differentiating between finality and exhaustion. *See infra* Part II.C.

applied the finality requirement, and because the plaintiffs did not request a variance or appeal the cease-and-desist order to the zoning board, the court held that no final decision had been rendered. *Id.*

In *Insomnia*, we held that the requirement to file a new plan is not an immediate injury in the context of an administrative process voluntarily instigated by the plaintiff. *Insomnia*, 278 F. App'x at 615-16. The plaintiff corporation alleged that the Land Use Control Board ("LUCB") denied its application to subdivide two parcels of land into three out of hostility to the "adult entertainment" industry. The LUCB instructed Insomnia Inc. to resubmit its application as a planned development instead of a subdivision, which would allow closer regulation of the property. *Id.* at 611. Insomnia Inc. appealed the denial to the Memphis City Council, was denied, and then sued in federal district court claiming First and Fourteenth Amendment violations. Applying the reasoning from *Murphy*, we held that (1) Insomnia did not suffer an immediate injury because it could file a new plan per the LUCB's instructions, and (2) that the possible rejection of the new application would further refine the contours of Insomnia's claims and aid future judicial consideration. *Id.* at 615–16. We applied the finality requirement to Insomnia's claims, held that there was no final decision, and affirmed the district court's dismissal.

I believe that, taken in context of the record as a whole, Northville's actions went further than the actions of the municipal actors in either *Murphy* or *Insomnia*. Context is vital in these cases because First Amendment rights are subject to close protection. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (Brennan, J., plurality opinion); *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (same). One reason First Amendment rights are stringently protected is "'the intangible nature o[f] the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" *Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (quoting *Cate v. Oldham*, 707 F.2d 1176, 1188–89 (11th Cir.

1983)).  "[C]onstitutional violations may [also] arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."  *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

Miles Christi has alleged sufficient "immediate harms" that it would be imprudent to apply the finality requirement to its claims.  First, Miles Christi claims that it cancelled a Bible study on account of the pretextual police surveillance.  This alleged harm occurred at a specific time in the past, and like the landowner's takings claim in *Lucas,* cannot be cured by a later administrative ruling.  Second, it claims that Northville's threats to ticket cars parked on the grass and the potential for further civil infraction tickets "chilled" the Order's religious activities.  This is likewise an immediate harm to protected First Amendment activities.[3]

Third, Miles Christi paid $5000 for an engineering estimate.  Although in *Insomnia* we did not conclude that requiring the plaintiff to file a new development plan was a harm, that case is distinguishable because there it was the plaintiff who sought a change in use and voluntarily initiated the administrative process that then had to be followed until a final decision was rendered.  Here, Miles Christi desires only to use its property as it always has and is allegedly being subjected to the review process on pretextual grounds; it is Frey's decision that necessitated this cost, and Miles Christi therefore suffers an immediate harm if its theory of the case is borne out.

Finally, Frey's decision put Miles Christi to the choice of submitting an expensive site plan or drastically curtailing or ceasing its protected activities.  When it refused, it was ticketed, haled into state court, and now faces the potential of a civil fine.  As noted, this case is not like *Insomnia*, or most other land-use cases, because Plaintiffs did not seek a change in use on their own and in fact claim that their use has not

---

[3]These first two harms cannot be redressed by any relief that the ZBA may potentially provide.  The majority dismisses these harms as ones that can be cured by an appeal to the ZBA, which may resolve the issue such that Miles Christi would not have to cancel any religious activities.  Notwithstanding the majority's assertion, the ZBA's hypothetical relief would do nothing to cure the past harms that Miles Christi has already suffered.  Thus, "the consequences of staying our hand" would be that Miles Christi's harms would never be redressed.

changed. It is also unlike *Murphy*, where the town had not yet taken the step of bringing the plaintiffs to court in order to subject them to a civil penalty. Here, Northville has tried to force Miles Christi into an expensive—and, Miles Christi claims, unwarranted—site review process and haled it into state court when it refused. Miles Christi has suffered immediate harm.

Miles Christi's claim that Northville's reasons are pretextual is supported by Northville's statement at oral argument that "football parties and tailgate parties" do not change "the residential nature of the use; whereas, what they're doing here, they're doing religious education and they're worshipping." When challenged by this Court counsel retreated from that statement, and I do not rest my conclusions on it; neither, however, can I simply ignore its troubling implications.

Because I would hold that Miles Christi has alleged sufficient immediate injuries, I need not address whether requiring Miles Christi to pursue additional administrative remedies would further define its allegations, and I would hold that the finality requirement does not apply to its First Amendment claims.

### C.      Frey's decision was "final"

In order to determine if Miles Christi's remaining claims under equal protection, due process, and RLUIPA are ripe, we must determine if Miles Christi has received a final decision. I would hold that it has.[4]

As I have already noted, "the finality requirement is concerned with whether the initial decisionmaker has arrived at a definite position on the issue that inflicts an actual, concrete injury." *Williamson County*, 473 U.S. at 192. The developer in *Williamson County* sued the local land planning committee in a § 1983 action for an unjust taking of its property by the application of various land-use regulations. *Id.* at 175. After the

---

[4]I would further note that my conclusion on the First Amendment claims is supported by this determination. *See Lucas*, 505 U.S. at 1012 n.3 (explaining that the plaintiff had received a final decision after holding that the requirement did not apply to his claims); *Guggenheim*, 582 F.3d at 1011–12 (holding that the prudential finality requirement did not apply, but noting that the conclusion was supported by the fact that the plaintiffs "substantially satisfied the *Williamson* requirements").

developer received approval for a preliminary plat and spent considerable resources on initial construction, the planning commission changed several applicable zoning ordinances and applied those changes to the developer's final plat applications. *Id.* at 177–79. These new regulations arguably rendered the project economically unfeasible. The planning commission then rejected the revised plat on a number of grounds. Although the Board of Zoning Appeals ruled in favor of the developer on appeal, the planning commission declined to follow the Board's ruling and rejected the final plat application. *Id.* at 181–82. The owner then filed suit under § 1983. A jury found for the developer, and the case was appealed all the way to the Supreme Court. The Court reversed, holding the matter unripe. *Id.* at 186. While the Court based its decision on two grounds, only the first, the finality requirement, is relevant here.[5]

Relying heavily on the specific local procedures, the Court held that the developer had not obtained a "final decision" because it did not apply for available variances from the Board or the commission. *Id.* at 188–89. Between the commission and the Board, the developer could have pursued up to five variances, any or all of which would have significantly ameliorated the commission's eight objections to the plat. This was critical because unless the developer applied for variances before submitting the plat for approval, the commission could reject the plat on any grounds, including those that could well be covered by variances. *Id.* at 190. Also, without knowing which regulations would or would not ultimately apply, a court could not determine whether the local rules would allow the developer to build his subdivision in an economically feasible way, and therefore neither a court nor a jury could value the taking.

The Court was careful to distinguish "finality," which was required, from "exhaustion," which was not. "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definite position on the issue that inflicts an actual, concrete injury . . . ." *Id.* at 193. Exhaustion, however, "generally refers to administrative and judicial procedures by which an injured party may seek review of an

---

[5]The second ground required the owners to "utilize the procedures Tennessee provides for obtaining just compensation," a requirement not applicable to this non-takings suit. *Id.* at 186.

adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.* To illustrate the difference, the Court provided several examples. The developer would not have had to seek a declaratory judgment in state court to challenge the zoning actions because such an action would "clearly [be] remedial." *Id.* at 193. "Similarly, [the developer] would not be required to appeal the Commission's rejection of the preliminary plat to the Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking." *Id.* These procedures "would result in a judgment whether the Commission's actions violated any of [the owner's] rights. In contrast, resort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow [the owner] to develop the subdivision in the manner [the owner] proposed." *Id.*

The Second Circuit has outlined four policy considerations that underlie the finality requirement in land-use cases:

> First, . . . requiring a claimant to obtain a final decision from the local land use authority aids in the development of a full record. Second, . . . only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel. Third, a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes . . . . Finally, . . . federalism principles also buttress the finality requirement. Requiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution.

*Id.* at 348 (internal citations omitted); *see Insomnia*, 278 F. App'x at 613 (citing *Murphy* factors).[6]

---

[6]Notwithstanding the unfortunate phrasing of the second policy consideration, that the owner should "exhaust[] the variance process," *Murphy* recognized *Williamson County*'s distinction between finality and exhaustion. *See Murphy*, 402 F.3d at 349 (recognizing that *Williamson County* does not require futile or remedial "exhaustion").

We have held plaintiff's RLUIPA and equal protection claims unripe where the plaintiff's position before the local land use authority was undefined. *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 618 (6th Cir. 2008) (hereinafter "*Grace Church*"). In *Grace Church*, a local Christian church applied for a special use permit to operate a residential facility. 544 F.3d at 611. The town granted the permit, but with several restrictions. *Id.* When the commission investigated an alleged violation, the pastor appeared before the commission but had no comment. *Id.* Faced with the one-sided evidence, the commission revoked the permit, and the church did not seek reconsideration, apply for a new permit, or appeal. Instead, it filed suit a year later in federal district court claiming violations of RLUIPA and equal protection. The district court dismissed for lack of ripeness, and we affirmed. Relying on *Murphy*'s policy considerations, we found that the record was insufficiently developed because the church was essentially silent during the local proceedings. *Id.* at 616. Furthermore, the church had not availed itself of any of the available avenues for local relief, denying the town the opportunity to render a final decision. *Id.* Therefore, we dismissed the suit as unripe.

The district court held that because Miles Christi did not appeal Northville's decision to the ZBA or otherwise avail itself of the zoning process, it did not obtain a final decision. Miles Christi responds that the district court confused exhaustion with finality, that Frey was the initial decisionmaker as empowered by local regulations, and that her testimony for Northville is determinative of Northville's final position on the matter under Fed. R. Civ. P. 30(b)(6). Northville argues that the ripeness doctrine requires that Miles Christi obtain a decision from either the Planning Commission or the ZBA. It further argues that Frey did not make a final decision, asserting instead that Miles Christi's actions triggered the events and Frey merely determined the next procedural step under the regulations. Finally, Northville argues that the ZBA has authority to modify, reverse, or affirm actions on appeal, and an appeal would not be futile.

I again note that Northville and the majority improperly conflate Frey's intensity determination with the possible end result of the zoning process. Because the two issues are distinct, and because Miles Christi focuses its complaint on the former, we must focus on Frey's decision and its effects. *See also Suitum*, 520 U.S. at 739 (distinguishing the determination that the petitioner's land fell within a protected zone from petitioner's possible option to apply for the right to transfer her building rights and focusing only on the former). After analyzing the decision and its effects, we must then examine Miles Christi's available administrative options and determine whether each is part of Northville's process for arriving at "final decisions," which would preclude a finding of finality, or whether they are purely "remedial," which would not. Just as *Williamson County* was guided by the contours of the local rules, so is my analysis here.

At the meeting with Fr. Bertolacci, Frey informed him that she had determined that Miles Christi's use of its property had intensified to the point where it had become a non-residential use. That determination was within her authority as Director of Community Development. As a result, Northville demanded a site plan and issued a civil infraction ticket when Miles Christi did not comply. As explained above, that ticket had the effect of haling Plaintiffs into state court.

Following Frey's determination and the issuance of the ticket, Miles Christi had a number of administrative options available to it. First, the Order could have appealed Frey's decision requiring a site plan to the ZBA under Northville Code § 170-41.4(A). This section allows for an "appeal" to the ZBA "by any person . . .affected by a decision of the . . . Director of Community Development." The ZBA would conduct a hearing, and could reverse or modify the decision "*only* if it finds that the action or decision appealed meets at least one of the following criteria: (a) [w]as arbitrary or capricious; (b) [w]as based on an erroneous finding of fact; (c) [c]onstituted an abuse of discretion; or (d) [w]as based on [an] erroneous interpretation of this chapter." *Id.* at §170-41.4(A)(3) (emphasis added). This option is remedial.

While the majority opinion attempts to paint this option as something else—an "ordinance interpretation"—it is purely an "appeal," similar to the appeal available to the plaintiff in *Williamson County*, which the Supreme Court held the plaintiff did not need to exhaust to have a final decision. Here, the ZBA was not involved in making the initial decision and would be merely reviewing Frey's decision.[7] Although the ZBA's standard of review is not a dispositive factor, I would note that the review here would likely not be *de novo*, as in *Murphy*, but would be done with some level of deference. Miles Christi did not have to exhaust this option.

Second, Miles Christi could file with the Planning Commission a request for a waiver from, or modification of, the parking and landscaping requirements under Northville Code §§ 170-24.13 and 170-26.1(K), or seek a variance from the ZBA under §§ 170.41.4(A)(5) and (6). It is unclear whether Miles Christi could request such relief before filing a site plan, but given the review requirements that appears unlikely. It is clear that these options have not been explored, and that a final decision on how the parking and landscaping regulations would apply has not been reached. However, none of these options can serve to modify Frey's intensity determination. Instead, they are remedial measures, designed to address only the *consequences* of Frey's determination. Miles Christi's claim all along, however, has been that the intensity determination, *itself*, was incorrect. These options, therefore, do not impact the finality of Frey's intensity determination, and Miles Christi did not have to exhaust them.

Finally, Miles Christi could file for permission from the Planning Commission or the ZBA to file a less-demanding site plan. Article 33 covers site plans, and exempts single family homes from having to submit one. *Id.* at § 33.2(A). The article, however, requires a "full site plan," not one of three less demanding options, when there is "[a]ny change in the use of the land or a building to a more intensive use, in terms of parking needs, noise, traffic volumes and similar impacts." *Id.* at § 33.2 (table). This article

---

[7]The majority opinion concludes, with minimal discussion of the local ordinances, that the ZBA is "empowered to participate in the decisionmaking process from the outset." A plain reading of the local ordinances and the facts of this case show that conclusion to be clearly wrong.

does not appear to contain a provision for less extensive review. Regardless, this option suffers from the same infirmity as the last, because Miles Christi would still be subject to Frey's decision that a more intensive use occurred, and even if the site plan requirement were less rigorous, the Order would still have to participate in a process it did not initiate or face the consequences for continuing its activities.

One thing Miles Christi could not do was file a request for a variance to be free from the site plan requirement. After a thorough review of the regulations, I find no variance listed in §170-41.4(B)[8] that applies to this circumstance, nor is there any "catch-all" clause. Even if a use variance could provide relief, in order to qualify for such a variance Miles Christi would have to show that "the site cannot reasonably be used for any of the uses allowed under current zoning," something it clearly could not do. *Id.* at § 170-41.4(B)(6)(b). Applying for such a variance would be futile, as the ZBA does not have the authority to alter any of the terms of the ordinance. *Id.* at § 170-41.6.

Given these available options, I would hold that, while Miles Christi has not exhausted its opportunities for administrative relief, it has obtained a final decision sufficient to ripen its claims. Frey, the initial decisionmaker, was empowered as the Director of Community Development to make the decision she did for Northville. That decision is subject to local appeal, but exhausting appeals is not required under *Williamson County*. Other available actions would not change Frey's decision that Miles Christi's use of the property had become more intensive. Therefore, "the initial decisionmaker has arrived at a definite position on the issue that inflicts an actual, concrete injury," and Miles Christi has obtained a final decision.

This result is supported by *Murphy*'s policy considerations, because (1) the record on the narrow question is sufficient, (2) the regulation is being applied to this parcel to require a site plan, and (3) the available variances do not provide the requested

---

[8]The majority opinion repeatedly refers to the obligation of Miles Christi to seek "an ordinance interpretation or variance" yet, tellingly, never identifies a single ordinance interpretation or variance available to Miles Christi. The reason for this omission is simple—none exists.

relief. The fourth factor, the respect for federalism, which is particularly strong in local land-use situations, does not support this conclusion, but no single factor is dispositive.

Frey's allegedly unwarranted decision also distinguishes this case from *Grace Church*. Unlike in that case, where the Church had sought the special permit and then refused to cooperate in developing a full record, Frey's decision thrust the site review requirement upon Miles Christi. The fact that Miles Christi did not participate in the process is irrelevant here because the very question before us is whether it can be forced to. Also, the parties developed a full record of the events leading up to Frey's decision in state court. The parties' positions are well defined and ready for adjudication.

Because Miles Christi suffered an immediate injury, the finality requirement does not apply. Even if it did, Miles Christi has obtained a final decision from the initial decisionmaker. I turn, finally, to the general ripeness standards to ensure that they are also satisfied.

### D.      **Miles Christi's claim satisfies general ripeness requirements**

As stated above, the general test for ripeness has been articulated as "two basic questions: 1) is the claim fit for judicial decision in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is the hardship to the parties of withholding court consideration?" *Warshak v. United States*, 532 F.3d 521, 526 (6th Cir. 2008) (en banc) (internal alterations, quotation marks, and citation omitted).

Given the foregoing discussion and the substantial overlap in the inquiries, I conclude that these factors are satisfied. The concrete factual context is Northville's conduct, Frey's intensity determination, and the resulting harms alleged by Miles Christi. Because the majority withholds judicial consideration, Miles Christi will have no recourse but to engage in the zoning process it did not initiate and argues was unlawfully required, and which cannot provide a complete remedy, or to cease or scale back its religious activities in the hope of avoiding future problems. Even the latter approach,

however, will not prevent Miles Christi from being fined in the already progressing state court suit.  Accordingly, I would hold that Miles Christi's claims are ripe, and that the district court erred in dismissing them.

## III.

I would reverse the district court's dismissal for lack of subject matter jurisdiction and remand for further proceedings.  Accordingly, I respectfully dissent.